# FRAZIER *v.* UNITED STATES.

No. 44.   Argued October 15, 1948.—Decided December 20, 1948.

*M. Edward Buckley, Jr.* argued the cause for petitioner. With him on the brief was *Milton Conn.*

*Robert W. Ginnane* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Robert S. Erdahl* and *Josephine H. Klein.*

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

Petitioner's primary complaint is that he has been denied the trial "by an impartial jury" which the Sixth Amendment guarantees. He was convicted of violating the Harrison Narcotics Act,[1] by a jury composed entirely of employees of the Federal Government. One juror,

---

[1] 26 U. S. C. § 2553. The indictment charged, substantially in the statutory language, that petitioner knowingly, wilfully, unlawfully and feloniously did "purchase, sell, dispense, and distribute" certain narcotic drugs "not then and there, in or from, the original stamped package."

Moore, and the wife of another, Root, were employed in the office of the Secretary of the Treasury, who is charged by law with responsibility for administering and enforcing the federal narcotics statutes.[2]   As against objections based on these facts and other matters, the Court of Appeals affirmed petitioner's conviction and sentence. 82 U. S. App. D. C. 332, 163 F. 2d 817.   He has sought relief here by application for certiorari limited to the issues relating to the jury's selection and composition. To review the determination made of them by the Court of Appeals we granted certiorari.   333 U. S. 873.

Petitioner's objections comprehend an attack upon the entire panel of prospective jurors, made during the course of *voir dire* examination, in an effort to have the panel stricken; a challenge to the jury as finally constituted, after petitioner had exhausted his ten peremptory challenges, *voir dire* examination had been completed, and the twelve jurors who tried the case had been qualified; and, either separately or in conjunction with his other objections,[3] a claim of reversible error on account of the

---

[2] Pursuant to 26 U. S. C. § 2606 the Secretary has delegated to the Commissioner of Narcotics "the investigation, detection and prevention of violations of the Federal narcotic and marihuana laws." 21 C. F. R., 1946 Supp., § 206.1.   The Bureau of Narcotics, created within the Treasury Department, 5 U. S. C. § 282, is subject to the Secretary's "general supervision and direction," 21 C. F. R., 1946 Supp., § 206.3, and its decisions are subject to review by him. 5 U. S. C. § 282c.   There were 87,830 employees in the Treasury Department as of September 30, 1948, of whom 19,645 were employed in the District of Columbia.   Monthly Report of Employment, Executive Branch of the Federal Government, U. S. Civ. Serv. Comm'n, September, 1948, Table V.   Published figures are not available to show the number of these employed by the Narcotics Bureau, but obviously in view of the number and diversity of the Treasury Department's functions they must have comprised only a comparatively small fraction of the total.

[3] See Part III *infra.*

inclusion of Moore and Root as jurors. An adequate understanding of the issues thus raised requires a condensed statement of the proceedings followed in the District Court in the selection of the jury.

Pursuant to customary practice, those proceedings began with the seating in the box of twelve prospective jurors for purposes of examination on *voir dire*. These twelve had been chosen previously, in accordance with prevailing practice, from jury lists maintained to supply grand and petit juries for all divisions of the District Court. Cf. D. C. Code (1940) § 11–1401, *et seq.* There is no claim that those lists were improperly made up. The usual preliminary examination began and continued until the noon recess, as is later noted, with counsel raising no question concerning the constitution of the lists or the panel.

Petitioner inquired, among other things, how many were Government employees. Five of the original twelve indicated they were. One of these was excused by the court. The other four, including Moore, remained unchallenged and served on the jury. The seven remaining veniremen, including two housewives, were engaged in private occupations. All seven were challenged peremptorily by petitioner.

To replace them and the one excused by the court, others including Root were called from time to time, and were examined in substantially the same manner as the original twelve. Altogether they numbered thirteen, nine Government employees, two in private employment, and two the nature of whose work does not appear. Of the latter, one was excused by the court and the other peremptorily challenged by the prosecution. Petitioner peremptorily challenged both of those in private employment and one of the nine in Government service. This exhausted petitioner's peremptory challenges and left

eight unchallenged Government employees to join the four like ones originally called in composing the twelve who made up the jury as finally chosen.[4]

The process of selection was interrupted shortly before noon, when petitioner still had two unused peremptory challenges, by a shortage of veniremen. Anticipating that others would be available later in the day, the court adjourned until 2:30 p. m. On its reconvening, additional prospective jurors were available. But petitioner then moved for the first time to strike the entire panel for alleged irregularity in the method used for selecting it, asserted to have been discovered by counsel through "a little investigation" during the noon recess. The court denied the motion, with leave to renew the objection in a motion for a new trial if petitioner should be convicted.[5] The material part of the colloquy relating to these proceedings and disclosing the grounds for the motion and its denial is set forth in the margin.[6]

---

[4] In summary, twenty-five prospective jurors were examined. Of these one was peremptorily challenged by the prosecution and two were excused by the court for cause. Of the remaining twenty-two, thirteen were in Government work, nine privately employed. Petitioner peremptorily challenged the nine and one Government employee, thus exhausting his peremptory challenges. In this manner the jury composed wholly of federal employees resulted. Prior to his trial petitioner made no individual challenge to any of the twelve who constituted the jury as finally selected. They included Moore and Root.

[5] The objection was renewed in petitioner's motions in arrest of judgment and for a new trial, and was denied in each instance.

[6] "Mr. BUCKLEY. If your Honor please, I have made a little investigation of the impaneling or selection of this panel here as well as selection of the other panels sitting this month, and I most respectfully submit that the method and procedure used in selecting is irregular, and I am going to move to strike this whole panel, the reason being this: that from the inquiries I have made, there were about five hundred or five hundred and a few jurors

Petitioner then exercised his two remaining peremptory challenges, after which he inquired of the twelve jurors then impaneled how many were employed by the Government. When all indicated they were, petitioner challenged the jury as impaneled for cause. The challenge and the court's ruling in denial of it appear below.[7] Although counsel sought to intermingle with this challenge

subpenaed—that is, individually subpenaed to appear here—from which they selected a sufficient number of jurors here.

"If there were five hundred, they were divided into two groups, two hundred fifty for one court and two hundred fifty for another court, and of the two hundred fifty for each court, they were asked how many of those two hundred fifty did not desire to serve as jurors, to raise their hands, so those who raised their hands were told to step to one side, and out of the remaining number that were left they picked the jurors, and the remaining number that were left consisted mostly of Government employees and housewives, and unemployed. There are only a few unemployed.

"I know Your Honor has read this case in the Supreme Court, *Thiel* v. *Southern Pacific Company*. This is not a proper cross-section.

"The COURT. The *Thiel* case holds that it must be shown that there was a systematic attempt to exclude a certain type or group of persons. . . . That is what that case holds, and that is not the situation here."

[7] "Mr. BUCKLEY. If Your Honor please, with reference to the motion which I made a while ago, moving to strike the whole panel, I now find myself in this position. I have exhausted my ten challenges.

"In selecting these different panels on the first Tuesday of the month, the Clerk says to the five hundred or two hundred fifty, whichever it may be, individuals who are summoned to appear here, from which to pick the juries, 'All those who do not desire to serve, step to one side.'

"That leaves a batch of Government employees and housewives.

"Now, I have exhausted my ten challenges, and here I have twelve Government jurors who are to decide this defendant's case, which is a violation of the Federal statute, being brought in a Federal Court, prosecuted by a Federal prosecutor, and the case is presented by

the one previously made to the panel,[8] the two are distinct attacks and must be treated separately.

I. *The method of selecting the panel.*—Apart from the objection that this challenge came too late, cf. *Agnew* v. *United States,* 165 U. S. 36, it is without merit. It consists exclusively of counsel's statements, unsworn and unsupported by any proof or offer of proof. The Government did not explicitly deny those statements. But it was under no necessity to do so. The burden was upon the petitioner as moving party "to introduce, or to offer, distinct evidence in support of the motion." *Glasser* v. *United States,* 315 U. S. 60, 87. See also *Smith* v. *Mississippi,* 162 U. S. 592; *Tarrance* v. *Florida,* 188 U. S. 519; *Martin* v. *Texas,* 200 U. S. 316; cf. *Brownfield* v. *South Carolina,* 189 U. S. 426.

Of itself this failure in tender of proof would require denial of the motion. But even if proof had been made or offered there would have been no showing sufficient to require contrary action. The statements, if treated as allegations, comprehended in substance but two things. One was the very brief statement of facts relating to the procedure followed, namely, the subpoenaing of about five hundred jurors, their equal division for assignment to two branches of the court, and that those in each group who did not wish to serve were "told to step to one side." This was all in the way of facts. From them followed counsel's vague and general conclusion that the

Federal agents. I submit there is reason to challenge these people for cause.

"The COURT. I will deny the motion and request at this time that you take it up later, in a motion after the verdict, if you think it is sound. I do not believe your motion is sound. Chance has resulted in this jury panel of twelve being composed of Government employees, but the jury list from which they by chance were selected is a mixture of Government employees and private employees."

[8] See note 7; cf. note 6.

remaining number, from which it was said jurors were picked, "consisted mostly of Government employees and housewives, and unemployed." Counsel then urged that this furnished basis for applying the decision in *Thiel* v. *Southern Pacific Co.*, 328 U. S. 217, as not affording "a proper cross-section."

The trial court rightly held the *Thiel* case inapplicable, for the reasons that it requires a showing of systematic exclusion or attempt to exclude from the panel a particular occupational group or groups otherwise eligible for jury service, and the statements and conclusions of counsel here disclosed no such attempt. Beyond this, moreover, it seems highly doubtful that the facts set forth in the statement, if proved, would constitute any irregularity. Nothing is stated concerning the numbers who stepped to one side, their occupational classifications, whether they were excused or, if any, how many, by whom or for what cause. For all one could know from the statement, those stepping to one side may have included but one in ten, and of these, half or more may have been held for jury service after claiming exemption or seeking excuse. The facts stated, therefore, taken in the light of pertinent facts omitted, lay no foundation whatever for counsel's conclusions, inferentially that jurors were selected only from those not standing aside, and explicitly that the remaining number "consisted mostly of Government employees and housewives, and unemployed." The statement was obviously insufficient to lay any foundation for valid attack upon the method followed in selecting the panel.

II. *Composition of the jury.*—The essence of this attack consists in counsel's statement, "Now, I have exhausted my ten challenges, and here I have twelve Government jurors who are to decide this defendant's case, which is a violation of the Federal statute, being

brought in a Federal Court, prosecuted by a Federal prosecutor, and the case is presented by Federal agents." [9] So put, the challenge has the sound of plausibility. Possibly it would have more of the substance of it if in this case it did not appear that petitioner himself was responsible, by deliberate choice, for the jury's final composition.

Given ten arbitrary choices among twenty-two prospective jurors not disqualified for cause, of whom thirteen were Government employees and nine privately engaged, he knowingly, of his own right, rejected nine of the latter and with knowledge or the full opportunity to secure it accepted without challenge all but one of the former. It would seem that ordinarily one anxious to secure a jury representative of both private and public employment in a community like Washington,[10] and particularly to avoid overweighting the jury with Government employees, well might have found a more effective way of utilizing his peremptory challenges to achieve those objectives.

The right of peremptory challenge is given, of course, to be exercised in the party's sole discretion and was so exercised here. We do not question petitioner's privilege to utilize his peremptory challenges as he did. But the right is given in aid of the party's interest to secure a fair and impartial jury, not for creating ground to claim partiality which but for its exercise would not exist.[11]

---

[9] See note 7.

[10] See note 17 *infra* and text.

[11] The right is in the nature of a statutory privilege, variable in the number of challenges allowed, which may be withheld altogether without impairing the constitutional guaranties of "an impartial jury" and a fair trial. *Stilson* v. *United States,* 250 U. S. 583, 586, quoted in *United States* v. *Wood,* 299 U. S. 123, 145.

Except in cases of treason and other capital offenses, no right to peremptory challenges existed in federal criminal trials until the Act of June 8, 1872, 17 Stat. 282, Rev. Stat. § 819, unless a rule of the particular federal court made applicable a provision of state law

It does not follow that by using the right as he pleases, he obtains the further one to repudiate the consequences of his own choice.

Here petitioner was given a fairly and lawfully selected panel. From it all disqualified for cause were excused. The fully qualified jurors remaining were fairly evenly distributed among persons publicly and privately employed. For reasons entirely his own, petitioner chose to eliminate the latter and retain the former. This was a deliberate choice, not an uninformed one. We need draw no conclusion concerning whether or not it was made for the purpose of creating the basis now asserted for objecting to the jury's composition.[12] Rather we must take it as having been made exactly for the purpose for which the right was given, namely, to afford petitioner an opportunity beyond the minimum requirements of fair selection to express an arbitrary preference among jurors properly selected and fully qualified to sit in judgment on his case. Cf. note 11. Any other view would convict him of abusing his privilege. This we are unwilling to do.

---

allowing peremptory challenges in noncapital cases. Act of April 30, 1790, § 30, 1 Stat. 112, 119; *United States* v. *Randall,* Fed. Cas. No. 16,118; *United States* v. *Cottingham,* Fed. Cas. No. 14,872; *United States* v. *McPherson,* Fed. Cas. No. 15,703; *United States* v. *Krouse,* Fed. Cas. No. 15,544. (However, the right of peremptory challenge in capital cases, which existed at common law, has been spoken of as "one of the most important of the rights secured to the accused." *Pointer* v. *United States,* 151 U. S. 396, 408; see also *Lewis* v. *United States,* 146 U. S. 370, 376.)

In noncapital cases, such as this, the privilege affords protection additional to constitutional guaranties, to be had exclusively at the party's option. If no such privilege had been given in the District of Columbia, the normal and valid course of selection in this case would have produced a jury composed both of federal employees and persons engaged in private occupations; in other words, would have made it impossible for petitioner to raise his objection to the jury's composition.

[12] See note 4; also note 11 and text.

By the same token we are not willing to join in repudiating the consequences of his own selection. We take petitioner at his word as expressed by his repeated choices. The fact that he exercised his peremptory challenges as he did, so frequently and consistently to eliminate privately employed jurors and retain only Government employees, hardly can be said to give cause for him to claim overweighting of the jury with Government employees. There was no defect of the panel in this respect. Nor is there any claim or basis for one that the prosecution utilized its peremptory challenges to bring about a jury constituted only of them. It would be going very far to say that in the circumstances shown by this record petitioner was deprived, either in law or in fact, of an impartial jury or indeed of one fairly representative of the community. If deprivation there was, even in the latter sense,[13] it was the result of his own choice, not of imperfection in the choices tendered him by law or in the procedures of selection afforded.

In ruling upon petitioner's objection the trial judge assessed the situation as follows: "Chance has resulted in this jury panel of twelve being composed of Government employees, but the jury list from which they by chance were selected is a mixture of Government employees and private employees."[14] Even in this view of what took place, petitioner has no cause to complain. The well-settled rule is that, given a lawfully selected panel, free from any taint of invalid exclusions or procedures in selection and from which all disqualified for cause have been excused, no cause for complaint arises merely from the fact that the jury finally chosen happens itself not to be representative of the panel or indeed of

---

[13] The assumption is not meant to imply that such a deprivation alone would constitute grounds for challenge to the jury. See text and authorities cited *infra* at note 15.

[14] See note 7.

the community.[15] There is, under such circumstances, no right to any particular composition or group representation on the jury.[16]

Finally, in this phase of the case, *United States* v. *Wood,* 299 U. S. 123, goes far toward precluding petitioner's objection. That decision sustained the Act of Congress of August 22, 1935, now D. C. Code (1940) § 11–1420, removing (with specified exceptions) the disqualification of Government employees previously existing in the District of Columbia for jury service in criminal and other cases to which the Government was a party. The disqualification had arisen in 1908 by virtue of the decision, made on common-law grounds, in *Crawford* v. *United States,* 212 U. S. 183.

Owing to the large and increasing proportion of Government to private employees in the District, the effect of the *Crawford* decision had been by 1935 to create difficulties in securing properly qualified jurors. To meet this situation the 1935 statute was adopted.[17] It con-

---

[15] *Ruthenberg* v. *United States,* 245 U. S. 480; *Thomas* v. *Texas,* 212 U. S. 278, 282; *Virginia* v. *Rives,* 100 U. S. 313, 322–323; *Higgins* v. *United States,* 81 U. S. App. D. C. 371, 372, 160 F. 2d 222, 223; see *Fay* v. *New York,* 332 U. S. 261, 284–285; *Thiel* v. *Southern Pacific Co.,* 328 U. S. 217, 220; cf. *Akins* v. *Texas,* 325 U. S. 398, 403–404.

[16] *Ibid.*

[17] See *United States* v. *Wood,* 299 U. S. at 132–133, quoting from the opinion of the Court of Appeals, 65 App. D. C. 330, 332, 83 F. 2d 587, 589. See also H. R. Rep. No. 1421, Sen. Rep. No. 1297, 74th Cong., 1st Sess.; 79 Cong. Rec. 13,401, relating to the bill which became the Act of Congress of August 22, 1935, now D. C. Code (1940) § 11–1420. The Government's brief in the *Wood* case, relying upon figures assembled from various official sources, indicated that of the probable 353,949 persons otherwise available for jury service in the District of Columbia as of 1935, some 156,874, or 44.3 per cent, were disqualified to serve either by virtue of exemption or by the mere fact of employment by or receipt of benefits from the Government, under the ruling in the *Crawford* case.

tinued specified exemptions previously existing, including all executive and judicial officers of the United States, and then directed in presently material part: "All other persons, otherwise qualified according to law whether employed in the service of the government of the United States or of the District of Columbia . . . shall be qualified to serve as jurors in the District of Columbia and shall not be exempt from such service . . . ." D. C. Code (1940) § 11–1420.

The *Wood* case was a criminal prosecution for theft from a private corporation. Three of the jurors were federal employees, challenged for cause on that ground. In sustaining the conviction and the statute the Court first held that Congress had not "undertaken to preclude the ascertainment of actual bias," and that the question in issue was limited to "implied bias, a bias attributable in law to the prospective juror regardless of actual partiality." 299 U. S. at 133, 134. As to this the Court said of the statute, "The enactment itself is tantamount to a legislative declaration that the prior disqualification [under the *Crawford* ruling] was artificial and not necessary to secure impartiality." *Id.* at 148–149. By way of sustaining the legislative judgment, the Court added on its own account:

"In criminal prosecutions the Government is acting simply as the instrument of the public in enforcing penal laws for the protection of society. In that enforcement all citizens are interested. It is difficult to see why a governmental employee, merely by virtue of his employment, is interested in that enforcement either more or less than any good citizen is or should be. . . . We think that the imputation of bias simply by virtue of governmental employment, without regard to any actual partiality growing out of the nature and circumstances of particular

cases, rests on an assumption without any rational foundation." *Ibid.*

The Court was not confronted in the *Wood* case with the exact situation we have here, namely, that all of the jurors finally selected were Government employees. But the purport of the decision was that the mere fact of Government employment, without more, would be insufficient under the statute's mandate to disqualify a juror. Implicit in this was the conception that, insofar as that fact alone is or may be effective, Government employees and persons privately engaged were put upon the same basis without any limitation, explicit or implied, upon the number who might be selected as jurors from either group.[18] The effect of these rulings, we think, was to make Government employees subject, as are all other persons and in the same manner, to challenge for "actual bias"[19] and under all ordinary circumstances only to such challenge. In that view, absent any basis for such challenge, we do not see how a right to challenge the panel as a

---

[18] Given of course a panel and jury otherwise selected in accordance with law. Since the *Wood* case the Court of Appeals for the District of Columbia has held that juries including four and nine Government employees were not inherently defective. *Great Atlantic & Pacific Tea Co.* v. *District of Columbia,* 67 App. D. C. 30, 89 F. 2d 502; *Higgins* v. *United States,* 81 U. S. App. D. C. 371, 160 F. 2d 222. The Court of Appeals for the Fifth Circuit has held that a Canal Zone jury composed entirely of persons who were either employees or tenants of the Government was not improperly constituted. *Schackow* v. *Government of the Canal Zone,* 108 F. 2d 625.

[19] The phrase "actual bias" is used in this opinion as it was in the *Wood* case. The *Wood* opinion stated: "The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as matter of law." 299 U. S. at 133. It later pointed out that "Challenges at common law were to the array, that is, with respect to the constitution of the panel, or to the polls, for disqualification of a juror. Challenges to the polls were either 'principal' or 'to the favor,' the former being upon

whole can arise from the mere fact that the jury chosen by proper procedures from a properly selected panel turns out to be composed wholly of Government employees or, *a fortiori,* of persons in private employment.

The opinion in the *Wood* case, however, was very careful to stress more than once that the Sixth Amendment prescribes no specific tests for determining impartiality. 299 U. S. at 133. It afforded further assurances, beyond those given by Art. III, § 2, cl. 3, relating to trial by jury, in respect to speed, publicity, impartiality, etc. *Id.* at 142. But it did not require in these respects "the particular forms and procedure used at common law." P. 143. The opinion emphasized especially that "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." Pp. 145–146.

This seems to contemplate implicitly that in each case a broad discretion and duty reside in the court to see that the jury as finally selected is subject to no solid basis of objection on the score of impartiality, even though that basis might possibly arise through the working of chance or other lawful factors wholly within the framework of proper procedures for selecting the panel and choosing the jury from it. Such a situation could arise, if at all, only in the rarest and most extraordinary combination of cir-

grounds of absolute disqualification, the latter for actual bias." Pp. 134–135. As appears from the portion of the opinion quoted in the text *infra* at note 23, the Court regarded "actual bias" or challenge "to the favor" as including not only prejudice in the subjective sense but also such as might be thought implicitly to arise "in view of the nature or circumstances of his employment, or of the relation of the particular governmental activity to the matters involved in the prosecution, or otherwise."

cumstances. But even if that possibility is taken as conceded, for the reasons we have already stated this case presents no such problem.

III. *The challenges to Jurors Moore and Root.*—Considered as independent and individual challenges for "actual bias,"[20] the objections to these jurors come too late. Moore was a Treasury messenger. Root's wife was a Treasury employee. Petitioner's counsel knew of the employment of Root's wife and that Moore was a federal employee. He did not inquire where Moore was employed, but could have known his employment's exact nature.[21] It does not appear that either Moore or Root's wife was connected with the Bureau of Narcotics or had any duty even remotely relating to its functions or those of the Secretary in relation to them.[22]

As respects challenge for "actual bias," the *Wood* opinion was careful to put Government employees on the same basis as prospective jurors privately employed. It stated:

> "All the resources of appropriate judicial inquiry remain available in this instance as in others to ascertain whether a prospective juror, although not exempted from service, has any bias in fact which would prevent his serving as an impartial juror. In dealing with an employee of the Government, the court would properly be solicitous to discover whether, in view of the nature or circumstances of his employment, or of the relation of the particular

---

[20] Cf. text *supra* at notes 3 and 8.

[21] Apart from petitioner's opportunity for discovery by specific inquiry, lists of jury panels, showing the name, age, address, and occupation of each member are prepared in the criminal division of the District Court for the District of Columbia and are available to counsel before trial on request.

[22] Cf. note 2.

governmental activity to the matters involved in the prosecution, or otherwise, he had actual bias, and, if he had, to disqualify him." [23]

Petitioner challenged neither Moore nor Root for "actual bias," though afforded the fullest opportunity legally and factually for doing so. After accepting them before trial, he could not challenge them successfully in a motion for a new trial. *Queen* v. *Hepburn,* 7 Cranch 290, 297; *Raub* v. *Carpenter,* 187 U. S. 159; cf. *United States* v. *Gale,* 109 U. S. 65. See *Kohl* v. *Lehlback,* 160 U. S. 293, 299–302. Whether or not employment in the Treasury outside the Narcotics Bureau would constitute ground for challenge for "actual bias," [24] such employment in the connections disclosed here affecting Moore and Root was not so obvious a disqualification or so inherently prejudicial as a matter of law, in the absence of any challenge to them before trial, as to require the court of its own motion or on petitioner's suggestion afterward to set the verdict aside and grant a new trial.

The challenge to Moore and Root stands no better if considered, not as a belated individual challenge for "actual bias" to each, but as additional support or buttressing for the challenge to the composition of the jury

---

[23] 299 U. S. at 133–134.

[24] In *United States* v. *Wood* the Court, speaking of the *Crawford* case, said: "It will be observed that the employment was in the very department to the affairs of which the alleged conspiracy related. But the decision took a broader range and did not rest upon that possible distinction." 299 U. S. at 140. It is at least highly doubtful that an employment having no more relationship to the particular governmental activity involved in the prosecution than did that of Moore in this case, cf. note 2, or that of Root's wife, would give ground for challenge for "actual bias," although coming under the same ultimate departmental supervision, even though if timely called to the court's attention the circumstance might afford basis for the court, in an excess of caution, to excuse the venireman.

as a whole. Apart from the fact that the two sorts of challenge are distinct and are therefore to be dealt with separately, the challenge to the composition of the jury as made to the trial court and as ruled upon by it, made no special reference to either Moore or Root or the particular bases for objection now raised to them.[25] Those references, so far as is shown by the record, first appeared in the assignments of error made by petitioner in the Court of Appeals. They therefore came too late, even if they could be considered as forming part of the challenge to the jury's composition or as adding anything of weight to that challenge.

Whether the matter is considered technically or on the broader, nontechnical basis of impartiality as a state of mind, petitioner has shown no ground for believing that he did not receive a trial "by an impartial jury" such as the Sixth Amendment assured him.

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE JACKSON, dissenting.

On one proposition I should expect trial lawyers to be nearly unanimous: that a jury, every member of which is in the hire of one of the litigants, lacks something of being an impartial jury. A system which has produced such an objectionable result and always tends to repeat it, should, in my opinion, be disapproved by this Court in exercise of its supervisory power over federal courts.

Were the employer an individual, a railroad, an industrial concern, or even a state, I think bias would more readily be implied; but its existence would be no more probable. This criminal trial was an adversary proceeding, with the Government both an actual and nominal

---

[25] See note 7.

litigant.  It was the patron and benefactor of the whole jury, plus one juror's wife for good measure.  At the same time that it made its plea to them to convict, it had the upper hand of every one of them in matters such as pay and promotion.  Of late years, the Government is using its power as never before to pry into their lives and thoughts upon the slightest suspicion of less than complete trustworthiness.  It demands not only probity but unquestioning ideological loyalty.  A government employee cannot today be disinterested or unconcerned about his appearance of faithful and enthusiastic support for government departments whose prestige and record is, somewhat, if only a little, at stake in every such prosecution.  And prosecutors seldom fail to stress, if not to exaggerate, the importance of the case before them to the whole social, if not the cosmic, order.  Even if we have no reason to believe that an acquitting juror would be subjected to embarrassments or reprisals, we cannot expect every clerk and messenger in the great bureaucracy to feel so secure as to put his dependence on the Government wholly out of mind.  I do not doubt that the government employees as a class possess a normal independence and fortitude.  But we have grounds to assume also that the normal proportion of them are subject to that very human weakness, especially displayed in Washington, which leads men to ". . . crook the pregnant hinges of the knee where thrift may follow fawning." So I reject as spurious any view that government employment differs from all other employment in creating no psychological pressure of dependency or interest in gaining favor, which might tend to predetermine issues in the interest of the party which has complete mastery over the juror's ambition and position.  But even if this suspicion can be dismissed by the Court as a mere phantasy, it cannot deny that such a jury has a one-sided

outlook on problems before it and an appearance of government leverage which is itself a blemish on the name of justice in the District of Columbia.

Because this semblance of partiality reflects on the courts, even if it does not prejudice the defendant in a particular case, I am not disposed to labor the argument as to whether counsel for this defendant did all that he might or should have done by way of objection. He did protest as soon as it was apparent what was happening to him, and that seems to me sufficient in face of adverse rulings. But even if defendant's objection were belated or technically defective, I still think the court deserves and should require a more neutral jury for its own appearances, even if defendant does not deserve and cannot demand one.

The cause of overloading this jury with persons beholden to the Government is no mystery and no accident. It is due to a defect in a system which will continue to operate in the same direction so long as the same practice is followed. While counsel did not prove it under oath, he stated it for the record and neither the District Attorney nor the learned Trial Judge, both of whom must have known the facts, denied or questioned his statement or asked him for better evidence. That defect is this: when the panel of jurors was drawn, the court appears to have asked all those who did not wish to serve to step aside, and they were excused from serving.

This amiable concession in some jurisdictions might produce no distortion of the composition of the panel; but it is certain to do just that in the District of Columbia because of the dual standard and dubious method of jury compensation. The nongovernment juror receives $4 per day,[1] which under present conditions is inadequate to be compensatory to nearly every gainfully employed

---

[1] D. C. Code, title 11, § 1513 (1940).

juror. But the government employee is not paid specially; instead, he is given leave from his government work with full pay while serving on the jury.[2] The latter class are thus induced to jury service by protection against any financial loss, while the former are subjected to considerable disadvantage.

This condition makes it obvious that, if jury service is put on virtually a voluntary basis and qualified persons are allowed to decline jury service at their own option, the panel will become loaded with government employees. If this undue concentration of such jurors were accomplished by any device which excluded nongovernment jurors, it unquestionably would be condemned not only by reason of but even without resort to the doctrine that prevailed in *Ballard* v. *United States,* 329 U. S. 187; *Thiel* v. *Southern Pacific Co.,* 328 U. S. 217; and *Glasser* v. *United States,* 315 U. S. 60.

Is the result more lawful when it is accomplished by letting one class exclude themselves, stimulated to do so by the incentive of such a dual system of compensation?

Of course, the defendant and the prosecution each have peremptory challenges, ten in this case, which enable each without assigning any cause to excuse that number whom they do not wish to have sit. This defendant used many of his challenges to excuse talesmen not employed by the Government and it is hinted that he may have packed this jury against himself. The learned Trial Judge made no such suggestion, however, and he would be better able than we to detect such tactics. He blamed the situation on "chance." But the fickle goddess is hardly to be blamed for the result when it can be seen that the cards were stacked from the beginning. This was plainly the case when we contrast unequal advantages which the two parties could get from their equal numbers of challenges.

---

[2] D. C. Code, title 11, §§ 1421–23 (1940).

518

The Government was confronted by no occasion to use any of its peremptory challenges to get rid of its adversary's employees. The defendant was. But if the defendant should try to use his challenges to excuse employees of the Government, he would dismiss one only to incur a probability of getting another. If he exhausted his challenges in this effort, it would still be futile, for no one claims he had enough to displace them all. It might not be wise tactics to show suspicion or disapproval of a class some of whom will have to sit anyway. Moreover, if he used his challenges as far as they would go to dislodge government servants, it would leave him helpless to challenge any of the nongovernment jurors, for which challenge he might have good reason.

The disadvantage of defendant as to talesmen from government ranks is more apparent but not more prejudicial than with talesmen from other walks of life. Whatever reason he may have had for excusing such a one, the price he would probably have had to pay for using his challenge was to have one government employee take another's place. The Government could vacate the seat of a nongovernment talesman with no such unwelcome results. The short of the thing is: in no case where the court has intervened to use its supervisory power to revise federal jury systems has there been any result so consistently and inevitably prejudicial to one of the litigants as here, under our noses. *Ballard* v. *United States,* 329 U. S. 187; *Thiel* v. *Southern Pacific,* 328 U. S. 217; *Glasser* v. *United States,* 315 U. S. 60. And in cases where a strong minority of the Court has wanted to go so far as to upset a state jury system, as offensive to fundamental considerations of justice spelled out from the due process clause of the Fourteenth Amendment, there has been no such brazen unfairness in actual practice. *Moore* v. *New York,* 333 U. S. 565; *Fay* v. *New York,* 332 U. S. 261.

The precedent of *United States* v. *Wood*, 299 U. S. 123, on which the Court leans heavily, is a weak crutch. That decision held only that the absolute disqualification of any federal employee, which had been declared in *Crawford* v. *United States*, 212 U. S. 183, could constitutionally be removed by the Congress. In the case the Court was considering only three out of the twelve were by chance government beneficiaries and the Court was not confronted with such a systematic distortion of the jury as was at work here. It held that, individually, they were not subject to challenge for cause; that is, they were not excusable by the court merely because they were government employees. But to hold that one or a few government employees may sit by chance is no precedent for holding that they may fill all of the chairs by a system of retiring everyone else. Furthermore, that opinion emphasized that the prosecution in that case was for larceny from a private corporation. That was not an offense against the Federal Government as such, except as it has responsibility for prosecuting crimes in the District that in the state would be a matter of no federal concern or even jurisdiction. But the prosecution before us is not for an offense of a private aspect; it is an offense against no one except federal government policy; and the Secretary of the Treasury, in whose own office one of these jurors was employed, has exclusive and nationwide responsibility for enforcement of the law involved.

If we admit every fact, premise, argument and conclusion stated in the Court's opinion, it still leaves this one situation unexplained and unjustified. In federal courts, over which we have supervisory power, sitting almost within a stone's throw of where we sit, a system is in operation which has produced and is likely again and again to produce what disinterested persons are likely to regard as a packed jury. Approval of it, after all that

has been written of late on the subject of juries, makes these lofty pronouncements sound a little hollow.

I would reverse this rather insignificant conviction and end this system before it builds up into a scandalous necessity for reversal of some really significant conviction.

MR. JUSTICE FRANKFURTER, MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY join in this opinion.