TOBIAS, J.,
concurs.
hi respectfully concur in the majority’s decision that holds that the evidence was sufficient to convict the defendants. However, I write separately to address why, in this case, I find that a reversal and remand is necessary under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
I read the evidence in this case as a bit stronger than the majority. Accordingly, I restate the facts as follows:
/.
The defendants Dejean Pierce and Tyr-onne Stevenson were convicted of the 17 *146 May 2009 second degree murder of Qian Sabatier (“Qian”) and the attempted second degree murder of Jerrold Smith (“Jerrold”).

Testimony of Cindy Woods

New Orleans Police Department (“NOPD”) Assistant Police Communications 911 supervisor Cindy Woods identified an audio recording of a 911 call under NOPD item # E-21968-09, and a written incident recall reflecting that call and incident. The audio recording was played for the jury. Ms. Woods confirmed on cross examination that no description of the perpetrators was mentioned in the 911 call.
| ^Testimony of Catherine Beckett
NOPD Detective Catherine Beckett was assigned to the homicide division on 17 May 2009. She investigated a shooting on that date at the “Bus Stop” bar at 8540 Hickory Street in New Orleans. Detective Beckett identified photographs of the scene, where she found an almost completely unresponsive female on the floor of the bar and a male, both having sustained multiple gunshot wounds. Numerous spent cartridge casings were on the ground, approximately thirty-AK47 casings and seventeen-9 mm casings. Because the male victim was in so much pain, the only thing she was able to learn from him was his name, before he was taken away by EMS. She also identified a Heckler & Koch .45 caliber semi-automatic handgun found in the bar that had blood stains on its grip. Detective Beckett instructed the crime scene technician to collect a sample of that blood. Nine to eleven witnesses were in the bar.
She learned from one witness, Jacqueline Washington, that two black males had been the perpetrators. The witness believed the perpetrators had something covering their faces. The witness told Detective Beckett that when she went to assist the male victim he took a weapon from his pocket and handed it to her, and she placed it on a shelf in the kitchen. The detective noticed that Ms. Washington had a blood stain on her hand, and so she instructed the crime scene technician to take a blood sample from that stain. Detective Beckett testified that seven bullets and nine bullet fragments were recovered from the female victim, Qian’s, body during an autopsy. She identified those items in evidence.
Detective Beckett interviewed shooting victim Jerrold at police headquarters on 19 May 2009; Detective Nathan McGee was also present. Jerrold came directly from the hospital, where he had been since being shot. Detective Beckett presented Jerrold a rights-of-arrestee form, advising him of his rights and that he was under investigation for being a felon in possession of a firearm and for | -¡possession of a firearm in an alcoholic beverage outlet. Jerrold waived his rights and gave a statement admitting that he had the .45 caliber handgun in his pocket at the time he was shot because he had been told by family members that his life was in danger. He stated that “DJ” and “Duke” shot him and killed Qian. He described “Duke” as short, wearing his hair in short twists, and wearing a white T-shirt. He said “Duke” had been armed with the AK47. Jerrold described “DJ” as taller than “Duke,” wearing his hair in a longer (than “Duke’s”) dreadlock style, and wearing black Dickies pants and a black Dickies shirt. He said “DJ” was armed with a 9 mm firearm with a very long extended magazine.
The detective described how Detective McGee prepared a photo lineup containing a photo of the defendant, Dejean “DJ” Pierce. He also determined that “Duke” was the defendant, Tyronne Stevenson. Detective Beckett prepared a lineup containing defendant Stevenson’s photo. Jerrold identified each defendant as one of the *147 two shooters in the respective lineups containing their photos.
Detective Beckett further explained that she was in the process of securing arrest warrants for the two defendants and search warrants for their residences when she was contacted by Detective McGee— who had left the office and was in the neighborhood where defendant Stevenson resided. Detective McGee informed her that he had observed defendant Stevenson standing outside in that neighborhood. Detective McGee arrested Mr. Stevenson at that time, thus circumventing the need for Detective Beckett to execute an arrest warrant and search warrant at the same time when it might have been possible to locate the guns involved in the crimes in Mr. Stevenson’s residence. A SWAT team executed search and arrest warrants at the residence of Dejean Pierce. A Desert Eagle .40 caliber semi-automatic handgun was recovered underneath a mattress in defendant Pierce’s bedroom, as well as what Detective Beckett described as an extended 9 mm caliber magazine, which was found inside the drawer of a Rnightstand in that room. Detective Becket replied in the negative when asked whether the 9 mm caliber magazine fit the .40 caliber handgun recovered. Also recovered from Mr. Pierce’s room was a black Dickies shirt matching the description given by Jerrold of the shirt worn by the “DJ.”
Detective Beckett also testified that they obtained a search warrant for a Dodge Charger automobile. Inside of it they found a handwritten letter and a temporary vehicle registration. The detective also identified two cell phone bills and a hospital bill addressed to Dejean Pierce, 9003 Nelson Street, the bills having been recovered from the same bedroom where the other evidence was recovered.
The detective identified a rights-of-ar-restee form she presented to defendant Stevenson, dated 19 May 2009 at 10:40 p.m., which he refused to sign. She testified that when she read Mr. Stevenson his rights, he said nothing. When she asked him if he wanted to make a statement, he said he had not done anything and asked the detective what she wanted to know. Detective Beckett said she indicated to a Detective Pardo (in Mr. Stevenson’s presence) that there were video recordings from the bar. She admitted this was untrue. However, she testified that at that point Mr. Stevenson looked up at her and began laughing. He pulled his T-shirt up over his nose, continued to laugh, and said: “You go [sic] video? You got video?” He then said, “Man, just take me to jail.”
Detective Beckett confirmed on cross examination by counsel for defendant Stevenson that the victims were alive when she arrived on scene shortly after the initial dispatch call went out. She stated that she filled out the request form to have some of the items of evidence tested, such as the recovered spent cartridge casings, spent bullets, and bullet fragments. She did not recall whether these items were tested. However, she later replied that counsel for defendant Stevenson was correct when he asked: “So — and just so I’m clear, there were no prints on the Rspent casings, right?” She also testified in response to a question by that same defense counsel that “fingerprints are unobtainable from a spent casing.”
Detective Beckett did not submit samples of blood located in various parts of the bar for testing. A cell phone was recovered, but its ownership was never determined. She confirmed that, while Jerrold screamed out in pain at the scene, he never screamed out anything like “Duke’ shot me,” “Tyronne shot me,” “DJ’ shot me” or “Dejean shot me.” Detective *148 Beckett confirmed that there were from eight to twelve people in the bar at the time of the shootings. It was learned from witnesses that each shooter had something concealing part of his face during the attack. Neither defendant was identified for police that night at the scene. When Detective Hamilton went to the hospital he learned that Qian had expired, and he learned from Jerrold that two individuals shot him. Detective Beckett confirmed that at that time Jerrold did not identify either of those persons as “Duke” or “DJ,” and not identify the shooters by their nicknames until 19 May 2009, after he was released from the hospital.
Detective Beckett further confirmed on cross examination that when Jerrold was released from the hospital, she instructed the Second Police District to have Jerrold transported to the homicide unit, where he was advised of his rights relative to his being under investigation for possession of a firearm by a convicted felon and possession of a firearm in an alcoholic beverage outlet. It was at this time, 19 May 2009, that Jerrold first identified the shooters as “DJ” and “Duke.” Detective Beckett confirmed that Jerrold was not arrested, although he admitted to possessing the .45 caliber handgun in the Bus Stop bar. Jerrold was later arrested on the gun charges, but they were refused by the District Attorney’s Office. The detective also confirmed that she had made arrangements to have Jerrold placed in a “safe house” in connection with the District Attorney’s Office’s witness protection program.
| nThe detective also confirmed on cross examination that no fingerprint evidence connecting defendant Stevenson to any of the spent cartridge casings was found at the scene. She said Jerrold told her he had not been drinking at the time of the shooting and she did not ask him whether he had been using any drugs that evening. She did not know the content of any toxicology tests on Jerrold’s blood from when he was treated for the gunshots at the hospital. Detective Beckett testified that the shooters were essentially directly in front of everyone in the bar, given that it was a very small bar. Other than Ms. Washington, no one gave a description of the alleged perpetrators because, Detective Beckett testified, they were so terrified they did not want to talk. She said all they kept saying was that they saw big guns and hit the ground. She subsequently contacted witnesses to have them come to her office and view the photo lineups, but they were not willing to do so.
Detective Beckett confirmed on further cross examination that when Mr. Pierce was arrested at his residence by SWAT team members, he did not resist. The detective confirmed that the black Dickies shirt seized from defendant Pierce’s bedroom was never tested for gunshot residue. Nothing of evidentiary value was recovered during a search of the Dodge Charger belonging to Mr. Pierce.
On redirect examination, Detective Beckett testified Jerrold reported that “DJ” had a bandana covering part of his face that fell down at some point and that “Duke” had a white T-shirt pulled up that also fell down. She replied in the negative when asked whether Jerrold had sought any consideration concerning possible firearms violations committed by him in exchange for information as to the perpetrators of the shootings.

Testimony of Kenneth Leary

Retired NOPD Officer Kenneth Leary was qualified by stipulation as an expert in the field of “the identification and comparison of ballistics.” Officer |7Leary worked in the firearms examination unit from 1989 until 2010, and had dusted objects for fingerprints prior to then, from 1984 to 1989. He testified that the .40 caliber Desert *149 Eagle handgun recovered from Mr. Pierce’s residence had no connection to the ballistics evidence recovered from the crime scene and the body of Qian. He testified that he had never recovered a fingerprint from a fired/spent cartridge casing. He explained that the chances of a fingerprint remaining on a cartridge casing after the explosion that is the firing of a gun were “not that great.” Officer Leary also testified on cross examination concerning gunshot residue. He stated that during the firing of a gun different chemical compounds in the gases coming out of the firearm could be transferred to the victim’s clothing (if the victim is close enough), to the shooter’s hand, or to the shooter’s clothing if the firearm is positioned close enough to the shooter’s body. He confirmed that every time the firearm is discharged the potential exists for gunshot residue to be expelled from the weapon. He confirmed that a test exists to determine whether gunshot residue is present on a person’s clothing, and that such a test could be done in the NOPD Crime Lab.

Testimony of Tarez Cook

New Orleans Police Officer Tarez Cook, who worked with the NOPD Crime Lab, processed the crime scene and wrote a report. He identified evidence collected at the scene and photographs he took thereat.

Testimony of Samantha Huber

Dr. Samantha Huber, qualified by stipulation as an expert in forensic pathology, performed an autopsy on Qian. The victim sustained twenty-two gunshot wounds, multiple abrasions from bullet fragments hitting her body, and minor blunt force injuries. All but two of the bullet wounds were received from the back, and all of them traveled at a downward angle from top to bottom. Fourteen of them were perforating or through-and-through wounds. Some of the | ¡¡wounds, around the hips and legs, suggested that she was most likely in a sitting position, with her legs at a ninety-degree angle to her body. The most serious gunshot wound was one that perforated her aorta, which caused her death from blood loss. Dr. Huber collected fifteen projectiles from Qian’s body. She found no evidence that would lead her to conclude that Qian had been used as a human shield.

Testimony of Jerrold Smith

Jerrold testified that he used to live in the “Pigeon Town” neighborhood of New Orleans, where he grew up. The corner of Hickory and Leonidas Streets is in that neighborhood. Jerrold was thirty-one years old at the time of trial. He had previously been convicted of possession of cocaine with intent to distribute and distribution of heroin. He replied in the negative when asked whether he was still in “that life.” He explained that he had a sixteen-year old son whom he did want to follow down the road he had been. He stated that his own father had been killed in 2008 at Hickory and Leonidas Streets, across the street from where he had been shot at the Bus Stop bar.
Jerrold testified that on 17 May 2009, he and Qian, whom he used to date, went to the Bus Stop bar. He was eating with his back turned to the door, while Qian had gone to play video poker. He identified the .45 caliber Heckler & Koch handgun he had in his possession that evening. He saw “Duke” and “DJ” enter the bar, but did not think anything of it and turned back around. He subsequently heard shots and started to turn around but was shot before he could do so. Jerrold testified that he, “Duke,” and “DJ” previously had what he characterized as a “semi-beef.” However, he said he had seen them a week or so earlier and they had just given each other hard stares. He said the *150 first shot hit him in his back and did not see who fired that shot. When asked who was shooting, he said it was “Duke” and “DJ.” He said that on that evening “DJ” had his hair in dreadlocks and was | gearing all black, with a t-shirt and a handkerchief. “Duke” had a white t-shirt over his face and was armed with an “AK” rifle.
Jerrold said he went to the floor, the only place he said he could go. He estimated about thirty shots had been fired at him and Qian. He was shot in the back, twice in the head, in his elbow, under his left foot, and had bullet fragments in his knee. The bullet that struck him in his back was still lodged in him, and one bullet that struck him in the head still remained behind his ear. When the shooting stopped and “Duke” and “DJ” left, he stated he was still holding onto to Qian’s hand. She was spitting up blood. He did not fire any shots, although he had the gun for protection. An officer on the scene asked Jerrold if the shootings had anything to do with his father, and he told the officer “no.”
Jerrold stated that he was transported from the crime scene to the hospital, where he remained for two days. When he left the hospital he was transported by NOPD officers to police headquarters, where he was advised of his rights. He admitted that he was in possession of crack cocaine on the day of the shooting and had been selling it, and that he also had smoked marijuana that day. He answered all the questions asked of him by the police. He did not ask for a deal or offer them a deal in exchange for his cooperation.
Jerrold identified the two respective photographic lineups in which he identified the defendants. He also identified them in court as the individuals who shot Qian and him.
He admitted on cross examination that on 14 November 2009, he was arrested in Baton Rouge for theft of goods, resisting an officer, and possession of marijuana. He admitted that he pleaded guilty to those charges. He also admitted to pleading guilty relative to a May 2010 charge of criminal damage to property and felony theft. He maintained that he thought he only had the two drug convictions, as he had testified to on direct examination. Jerrold confirmed, as he |10had on direct examination, that he acquired the handgun he was carrying the evening of the shootings in exchange for crack cocaine. He admitted that the prosecutor had informed him that his post-shooting hospital toxicology tests had been positive for cocaine and marijuana. He admitted that he had cocaine in his mouth when he was inside the bar, but did not know whether he spit that cocaine out or had swallowed it.
Jerrold testified that the lights were dim inside the Bus Stop bar that night. He recognized “Duke” and “DJ” the moment they entered the bar, emphasizing that he knew them. He admitted that, although he was eventually arrested for possessing the gun in the bar as a convicted felon (he turned himself in), he was released without having to post a bond. It was unclear to him if he was arrested on both possession of a firearm by a convicted felon and possession of a firearm in an alcoholic beverage outlet. He was shown a document reflecting that a May 2009 charge of being a convicted felon in possession of a firearm was refused by the district attorney on 3 November 2009. Jerrold said he had been unaware the charge had been refused, and that he believed it was still pending. He indicated he had not really been concerned about having a pending gun charge. He denied that he was lying so he would not go back to jail for being a felon in possession of a firearm or possessing a firearm in *151 an alcoholic beverage outlet. Jerrold confirmed that his son told him that “Duke” and “DJ” were going to kill him, yet he still saw them enter the bar and had turned back around before the shooting.

II.

In the case at bar, the defendants/appellants raise a Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)[1] issue.[2] They contend that the peremptorily-challenged juror, Cindy Ehrlicher, was improperly seated on the jury over the defense’s objection.
| ¶ T Peremptory challenges are required in criminal cases under our state constitution. La. Const. art. I, § 17. Federal constitutional law does not recognize a right to peremptory challenges, such being a matter of state law. See Rivera v. Illinois, 556 U.S. 148, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009). Most states do provide peremptory challenges in some form. Id, citing Frazier v. United, States, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187 (1948).
Under Batson and its progeny, it is (a) not only the right of the accused to have the juror of his choosing who has been removed improperly, but (b) also the right of the juror to serve. See Batson, 476 U.S. at 87, 91, 106 S.Ct. 1712. Because the trial judge placed Ms. Ehrlicher on the jury panel, the latter is not an issue.
Louisiana courts have not directly addressed the question of whether a harmless error, La.C.Cr.P. art. 921, analysis is applicable to a Batson challenge.[3] Other courts around the country have applied a harmless error analysis to a Batson challenge under certain circumstances.
In Rivera, supra, the United States Supreme Court addressed this issue and approved of the harmless error analysis applied by the Illinois Supreme Court after the trial court denied the defendant’s use of a peremptory challenge, believing that the defense was discriminating against a particular prospective juror. Dissatisfied with the proffered reasons given by defense counsel for challenging the prospective juror, the trial court denied the challenge and the juror was seated. The defendant was found guilty of first degree murder.
The case was eventually heard by the Illinois Supreme Court. That court rejected the defendant’s ultimate argument that the improper seating of the juror ranked as reversible error without a showing of prejudice. Citing the United States 1 ^Supreme Court’s guiding decisions, the Illinois court observed that “the Constitution does not confer a right to peremptory challenges.” Id., 556 U.S. at 155, 129 S.Ct. 1446. Accordingly, the Illinois court held that the denial of Rivera’s peremptory challenge did not qualify as a structural error requiring automatic reversal. The court saw no indication that Rivera had been “tried before a biased jury, or even one biased juror.” Id. [emphasis by the *152 court]. In that regard, the court stressed that Rivera did “not suggest that Gomez [the juror in dispute] was subject to recu-sal for cause.” Id.
The Illinois court, relying on both federal and state precedents, proceeded to consider whether it was “clear beyond a reasonable doubt that a rational jury would have found [Rivera] guilty absent the error.” Id. After reviewing the trial record, the court concluded that: “Gomez’s presence on the jury did not prejudice Rivera because any rational trier of fact would have found [Rivera] guilty of murder on the evidence adduced at trial.’ ”
Because Ms. Ehrlicher served on the jury and voted with the eleven other jurors for conviction of the appellants in their unanimous twelve-to-zero verdicts, I do not agree that a reversal is automatically required. Under Louisiana law, a ten to two verdict would have been enough to convict these defendants. La.C.Cr.P. art. 782. Instead, I would first consider whether it was clear beyond a reasonable doubt that a rational jury would have found these defendants guilty absent the error. This requires that we review in detail the trial record in order to ascertain whether the error is harmless or not.[4] See State v. Hearold, 603 So.2d 731 (La.1992). In light of the law regarding Batson challenges, we can only properly address the Batson issues if we do so in pan materia -with the appellants’ 113arguments regarding the sufficiency of the evidence. The Batson arguments may be harmless if the evidence overwhelmingly supports the verdicts of guilt and/or no rational jury would have returned a verdict of not guilty. That is, the harmless error must be so beyond a reasonable doubt. As the Louisiana Supreme Court recently stated:
Nevertheless, a trial error does not provide grounds for reversal of a defendant’s conviction and sentence unless it affects substantial rights of the accused. See La.C.Cr.P. art. 921; State v. Johnson, 94-1379, pp. 16-17 (La.11/27/95), 664 So.2d 94, 101-02. The test is whether there is a reasonable possibility the error might have contributed to the conviction and whether the court can declare a belief that the error is harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 22-23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); State v. Green, 493 So.2d 1178, 1185 (La.1986). The reviewing court must find the verdict actually rendered by this jury was surely unattributable to the error. Johnson, 94-1379 at 18, 664 So.2d at 101-02; Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)....
State v. Magee, 11-0574, pp. 45-46 (La.9/28/12), 103 So.3d 285, 318; see also State v. Nelson, 10-1724 (La.3/13/12), 85 So.3d 21.

III.

From my reading of the cold record, I would have found the defendants guilty as charged beyond a reasonable doubt. However, I cannot say (because of the credibility issues and the failure of eyewitnesses, save Jerrold, to testify) that Ms. Ehrlicher may have convinced three or more of her fellow jurors, who may have been leaning to acquittal, to vote for conviction of the *153 defendants. Therefore, I respectfully concur.

. See also Snyder v. United States, 554 U.S. 908, 128 S.Ct. 2947, 171 L.Ed.2d 874 (2008).

. In addition, defendant/appellant Tyronne Stevenson raises as error the trial court’s denial of his motion for mistrial as to (a) the state’s reference to the defense not having evidence forensically tested and (b) other crimes committed by them. However, in light of the reversal for a Batson violation, I find we may pretermit a discussion of those issues.

. The Louisiana Supreme Court has held that the harmless-error analysis is the appropriate standard of review of a district court ruling prohibiting a defendant from using a peremptory challenge to back strike a provisionally-challenged juror in violation of La.C.Cr.P. art. 799.1. State v. Lewis, 12-1021, p. 13 (La.3/19/13), 112 So.3d 796, 804.

. An example of a case where a harmless error analysis would be especially appropriate, but not the facts in the case at bar, would be the following: a person is convicted of second degree murder by an eleven-to-one jury verdict where the evidence consists, inter alia, of the testimony of ten eyewitnesses to the wrongful act that was also captured from two different angles by two different high-definition video cameras, one of which belonged to the police and the other belonging to a private business, all in broad daylight.